BRIDGETON (GREEN v.). See Case No. 5,-754.

---

## Case No. 1,864.

### The BRIDGEWATER.

[4 Cin. Law Bul. 448; 11 Chi. Leg. News, 327.]

District Court, E. D. Michigan. 1878.

SHIPPING—POWERS OF MASTER—SALE OF CARGO—WHEN VALID—TRADE ON GREAT LAKES — NECESSITY — COMMUNICATION WITH OWNER — EVIDENCE—SALVAGE SERVICES.

[1. In the trade upon the great lakes, where voyages are short, harbors of refuge many, and telegraphic communications with the owners easy, a master has no power to sell any portion of the cargo except where an immediate sale is the only alternative to a total loss by jettison.]

[2. To justify a sale of ship or cargo by the master it must appear that it was necessary that it was made in good faith, and that the master was unable to communicate with the owner before the necessity for action became imperative.]

[See Pope v. Nickerson. Case No. 11,274; Astrup v. Lewy, 19 Fed. 536; The Ann D. Richardson, Case No. 411; De Bruns v. Lawrence, Id. 3,716.]

[3. A sale of the cargo of a stranded ship by the master is unnecessary, and therefore void, if he could have transshipped or stored the cargo, or if he had any other alternative which a prudent owner on the spot would adopt.]

[4. The purchaser of the cargo of a stranded vessel upon a sale by the master will not be heard to say that a sale was necessary by reason of the purchaser's refusal to permit his vessel to be used for a transshipment.]

[5. The sale by the master of a vessel run aground near the straits of Mackinaw of her cargo of wheat, is void for bad faith on his part when it appears that the master proposed a corrupt sale to one of the purchasers; that the price was 10 cents a bushel when within twenty-five miles it was 50 or 60 cents, and the wheat was insured at a valuation of one dollar a bushel, and that the master did not disclose the transaction to his owners or underwriters, but absconded with the proceeds of the sale.]

[6. On setting aside a sale of cargo by the master of a stranded vessel as having been made in bad faith, the purchaser may be allowed compensation in the nature of salvage for caring for the cargo, but not the purchase money which the master has embezzled.]

[7. Persons who are in a position to render salvage services may make a reasonable bargain to that end, but they will not be allowed to take advantage of the peril of others by compelling a sale to themselves on unconscionable terms. Post v. Jones, 19 How. (60 U. S.) 150, followed.]

[In admiralty. Libel by the Traders' Insurance Company and other underwriters of the cargo of the schooner Bridgewater to recover from one Dingman and others a portion of said cargo, alleged to have been fraudulently sold by the master. Decree for libellants.]

In November, 1876, D. W. Erwin shipped on board the schooner at Chicago 36,000 bushels of wheat, consigned to Buffalo, upon which he effected an insurance of the same by libellants in the sum of $38,600. The schooner immediately left for Buffalo, and on Sunday, November 28th, about six o'clock in the evening, ran hard aground, in a heavy storm, upon Crane island, near

Wangoshance light, the extreme northwesterly point of the lower peninsula of Michigan, and near the entrance to the straits of Mackinaw. The next morning the second mate was sent by the master to Mackinaw, about twenty-four miles distant, to telegraph to Detroit for a tug, but apparently without any instructions to telegraph to the owner of the vessel, the underwriters, or any person interested in the cargo. On Sunday, Monday, and Tuesday the weather was very bad, but the schooner lay hard aground, and does not appear to have suffered any material injury. On Wednesday the weather began to moderate, and by evening became fine, and so continued until Saturday evening, when the vessel was gotten off with the assistance of the tug Niagara, which had arrived early on Thursday morning. The second mate, who had been sent to Mackinaw to telegraph, after making some ineffectual efforts to find a wrecking tug, applied to Dingman, the principal defendant in the case, to take him back to his vessel upon a small tug owned by him, which was done. On boarding the schooner, which was then lying well out of the water, and covered with ice, which was constantly increasing in thickness, the master inquired of Dingman whether there was any lighters in that part of the country. Dingman replied that there were no tugs or lighters except the one he had; the master then asked Dingman to return to Mackinaw, telegraph again for him, and get him all the men he could to throw the wheat overboard; at least this was Dingman's version of the conversation, and as the master, the only other person present at the interview, could not be found, there was no other testimony upon that point. Dingman returned to Mackinaw, engaged a lot of men under promise to give them a proportion of the wheat, if he could succeed in buying it, which he appeared to have anticipated doing, and took them with his tug and lighter to the vessel, arriving there about three o'clock on Thursday morning. He then informed the captain that he had received a dispatch that a tug had started from Detroit, and would be there about daylight. The tug in fact did arrive there between eight and nine o'clock, and found the wheat being discharged into Dingman's lighter. In the course of the day the lighter was loaded with about 2,500 bushels of wheat, for which Dingman paid the master $280, and, after assisting in putting the steam pumps on, the schooner returned to Mackinaw, encountering on the passage very considerable difficulty and danger from floating ice. Several fishing boats and other small crafts were loaded with wheat from the schooner the same day, and a large amount thrown into the lake. The tug Prindiville also arrived to assist the Niagara in pulling the schooner off. Having unloaded his barge, Dingman again returned to the Bridgewater

with the barge and two or three small schooners, bought another barge load at $200, and three schooner loads at $50 each; having purchased in all about 6,500 bushels, for which he paid the captain $630, a little less then ten cents per bushel. The master also sold on Friday about 6,500 bushels to one Ryerse, which was loaded upon the barge Frankfort, and for which Ryerse seems to have paid the captain $1,100. The entire amount sold to Dingman, Ryerse, and to other buyers who flocked about the schooner in small vessels, including the amount thrown into the lake, aggregated about 22,000 bushels. Thus lightened of her cargo, with the assistance of the two tugs, the schooner was finally gotten off on Saturday evening, and towed to Detroit.

Moore & Canfield, for libellants.
H. H. Swan and G. V. N. Lathrop, for respondents.

BROWN, District Judge. Settlements having been effected with all the claimants except Dingman, the case is presented to the court as if he were the sole claimant. Instances of the sale of ships or cargoes by the master, in cases of necessity, are not unfrequent upon the ocean; but my attention has not been called to any reported case, arising upon the lakes or rivers, where the power of the master in this regard has been discussed. In view of these comparatively short voyages here, the constant proximity of ports or harbors of refuge, and the facility of communication by telegraph, it seems impossible that a case should arise where the master would be justified in selling the ship, except under the direct instructions of the owner. If an exigency could occur which would authorize him to dispose of the cargo, or any material portion of it, it must be in some rare and exceptional instance where an immediate sale is the only alternative of a total loss by jettison, and timely communication with the owner is impossible. Such a state of facts is claimed by the defense as justifying the sale in this case.

All the authorities are agreed that three contingencies must concur to support a sale by the master of either ship or cargo, namely: 1. Necessity that a sale should be made. 2. Good faith on the part of the master in making it. 3. An inability to communicate with the owner before the necessity for action becomes imperative: Patapsco Ins. Co. v. Southgate, 5 Pet. [30 U. S.] 618; The Amelie, 6 Wall. [73 U. S.] 25; The William Carey [Case No. 17,689]; The Tilton [Id. 14,-054]. Whether under the case of Post v. Jones, 19 How. [60 U. S.] 150, a market and opportunity for competition are not another pre-requisite to a valid sale will naturally arise in a further discussion of this case. Applying these tests, then, to the sale of the Bridgewater's cargo, the first question which

presents itself is, was the sale necessary within the meaning of the law? I think not. I do not care to draw a distinction here between an urgent or extreme necessity, and what in some cases is termed a moral necessity, for it seems to me practically valueless; if in any case there is an alternative which a prudent owner, if he were on the spot, would adopt, the sale is not necessary within the meaning of the law. In other words, it is only justifiable as a last resort. If he can tranship his cargo or take it out and store it, he is bound to do so. But the master of the Bridgewater made no attempt to do this. Even Dingman does not swear that he used any effort to save the cargo, but wanted him to hire men to throw it overboard. Of his conversation with the master on his first trip to the schooner, we have Dingman's version alone, but it is at least suspicious that when he returned to Mackinaw, he hired his men by promising them, not wages, but a portion of the wheat, as if he had fully made up his mind to buy it; if indeed he had not already made a contract to that effect. While he denies in his testimony that a sale of the cargo was spoken of on his first visit, he expressly avers in his answer that he returned to Mackinaw at this time "at the request of the master and after some negotiations in regard to the purchase of a portion of the cargo." The testimony of Ryerse is still more explicit; he says that he went to the schooner with his lighter, expecting to be hired, but the master made no offer to hire him or his barge, but insisted upon selling him a load of his wheat. There is no testimony whatever, that he made an effort to save any part of his cargo, or to procure a transshipment or storage. But it is argued that the master had no assurance that a tug was coming until Dingman's return on Thursday morning; that there was a probability of his vessel lying there all winter, and that she would lie easier and steadier and with less liability to drift if her cargo remained on board. This may be true, and yet the probability was that a tug would be sent in answer to the mate's telegram, and I think it was his duty, instead of spending Monday and Tuesday in idleness, as he seems to have done, to look about the neighborhood and see whether lighters could not be procured, and have them in readiness in case it became necessary to use them.

While there seems to be some doubt as to whether lighters and proper storage for a large quantity of wheat could have been had at Mackinaw, the evidence satisfies me that there would have been no difficulty in obtaining both at Sheboygan. It is true that there was some ice in the harbor there on Monday and Tuesday, although not enough to prevent a tug and lighters coming out. But from Wednesday onward through the week, the harbor was clear, and no difficulty would have been experienced, either in obtaining lighters or getting them to the schooner. All the difficulty that Dingman had seems to have been going and coming the first time, and certainly there was no lack of boats and lighters about the schooner as soon as it became noised abroad that the master was selling his wheat at ten cents per bushel. Wrecks in the vicinity of the straits of Mackinaw are very frequent, particularly late in the season, and it seems to me that a competent master could not but know that lighters were kept in and about Sheboygan and Mackinaw, for the purpose of aiding vessels in distress. At least he should have made the effort, and he cannot now be heard to say that it would have been unsuccessful. Neither does it lie in Dingman's mouth to argue that a sale was necessary, because he refused to hire out his lighter or assist in a transhipment. A man has no right thus to create a necessity by his own act and then make use of it for his own emolument: Post v. Jones, 19 How. [60 U. S.] 150.

2. But if there were any doubt at all, with regard to the necessity for a sale, there is none whatever as to the entire want of good faith on the part of the master in making it. His conduct was simply scandalous. I have already alluded to the fact of Dingman's hiring men to go to the schooner, by promising them a portion of the cargo, as tending to show that the master had made arrangements to sell to Dingman, even before he knew the tug was coming, and that he had good reasons to believe the necessity would arise for his unloading a portion of the cargo. This may be but slight evidence of bad faith, but the testimony of Ryerse upon this point is damning. On learning of the wreck, he took his tug and the barge Frankfort, and went to her for the purpose of assisting in getting her off. He testifies: "I had met the captain before, and he was acquainted with me; we had some little conversation—I don't know what it was—about the grain, and he said to the men to go on loading. I said no, not to put any aboard, until I had made some arrangements, and in our conversation, or about the commencement of our conversation, he said: 'I suppose I ought to make some show or pretense of hiring your barge or tug, but,' he said, 'I suppose you don't want to hire.' I said, 'No, sir.' I understood from this conversation that he did not want to hire the tug; he wanted to sell the grain. He says then: 'Very well; what will you pay me for a cargo of the grain?' I told him what I would pay him; the price did not suit him; we had some dickering about it. He called me into his cabin, and we talked matters up. He said to me: 'Now, your boat carries 8,000 bushels of grain. Now, you can pay me a good price for this. You pay me $2,500 for the grain, and put $500 in your pocket, and charge them $200 for the cargo, and we will both make some-

thing out of it.' I told him, 'No, sir.' My employers pay me a fair rate of wages. I was at work for them some time, and expected to do so, and I did not feel like robbing them; that I would not be a party to anything of the kind, and went on and made a bargain with him for a cargo of the grain."

Ryerse's testimony was attacked by the defense as contradictory and unworthy of belief. But, while there are some discrepancies in it, it does not seem to me that there are any that are material, and as his testimony coincides so well with the admitted conduct of the master, I am not disposed to reject it. It is true he bought the cargo at a comparatively low rate (though nearly double what Dingman paid), but he can scarcely be blamed for that, having used no deception to obtain it, particularly as he seems to have surrendered it immediately upon a claim being made by the underwriters. The price at which the master disposed of this wheat was a mere bagatelle. Good dry wheat was sold at an average of ten cents a bushel, when within twenty-five miles of there it could have been sold at fifty or sixty cents, and it was insured at a valuation in Chicago of somewhat over a dollar. Including all the risks and expenses of taking this wheat to Sheboygan or Mackinaw, the price seems altogether inadequate. Apply the test in salvage cases to this transaction. Suppose the master had made an agreement with the vendees, as salvors, to take the wheat to Mackinaw for a salvage, or four-fifths its value, would the court have sustained and enforced such an agreement? It seems to me very clear that it would not. Conceding the master to have acted in good faith, if Dingman took advantage of his position to impose a hard bargain upon him, the court ought to relieve against it, whether it takes the form of salvage or sale.

The remarks of the supreme court in the case of Post v. Jones, 19 How. [60 U. S.] 150, are applicable here. In that case a whaling ship was run upon some rocks on the coast of Behring straits, with nearly a full cargo of oil on board. While in this position, and with no hope of getting off, the master sold his cargo to two other whaling ships, which happened to be in the neighborhood. The master went through the form of an auction, by posting advertisements on each side of the three vessels that a sale would take place on the following day. Mr. Justice Grier says: "All the cases assume the fact of a sale in a civilized country, where men have money, where there is a market and competition. They have no application to wreck in a distant ocean, where the property is derelict, or about to become so, and the person who has it in his power to save the crew and salve the cargo prefers to drive a bargain with the master. The necessity in such a case may be imperative, because it is not of that character which permits the master to exercise this power. * * * The contrivance of an auction sale, under such circumstances, where the master of the Richmond was hopeless, helpless, and passive—where there was no market, no money, no competition—where one party had absolute power, and the other no choice but submission—where the vender must take what is offered or get nothing, is a transaction which has no characteristic of a valid contract. * * * It has been contended, also, that the sale was justifiable and valid, because it was better for the interests of all concerned to accept what is offered than to suffer a total loss. But this argument proves too much, as it would justify every sale to a salvor. Courts of admiralty will enforce contracts made for salvage service and salvor compensation, where the salvor has not taken advantage of his power to make an unreasonable bargain; but they will not tolerate the doctrine that a salvor can take advantage of his situation, and avail himself of the calamities of others to drive a bargain; nor will they permit the performance of a public duty to be turned into a traffic of profit." The case is strikingly like the one under consideration. Here, too, there was a wreck upon an isolated rock, there was no market, no competition, and but little money. These defendants, who should have gone to the wreck as salvors, and relied upon the generosity of the underwriters or of the courts for their compensation, appear to have gone simply with the intention of wringing the best bargain they could from the necessities of the master.

A further fact having a strong tendency to show bad faith upon the part of the captain is his protest made at Detroit, on the 9th of December. In this, although he details the loss and his efforts in getting the vessel off with considerable elaboration, he makes no mention whatever of the sale of any portion of the cargo. In the protest as first made he speaks of the entire cargo as saved in a damaged condition, and in an addition subsequently inserted he says, "Of the cargo about 25,000 bushels was jettisoned before getting afloat." Both of these statements were false.

But last and worst of all; although he received from $1,800 to $2,000 in cash he never reported the sale to his owners or to the underwriters nor accounted to them for any portion of the money. In fact he shortly afterwards absconded, and has never been seen since. Indeed the underwriters supposed the wheat had been thrown overboard until some months after, they learned that a large quantity of it was lying in and about Mackinaw. For these reasons it seems to me quite clear that this sale cannot be supported. "It is true," as remarked by Mr. Justice Story, in The Tilton [Case No. 14,054], "the subsequent conduct of the master ought not to prejudice the claimants, who were not parties to his acts, but it is im-

possible wholly to disentangle his acts from one another."

I think, however, that Dingman is entitled to his expenses in saving and storing this wheat, and to a reasonable compensation for his own services, and for that of his barge, in getting it off the vessel to Mackinaw; but I do not think he is entitled to be reimbursed for the money paid the master. I have already found the sale was not necessary, and he was legally bound to know this fact; if the master, then, had no authority to sell, he had none to receive the money; in other words, he was not the agent of the owners in receiving it, and they cannot be chargeable for his embezzlement. Had the money been actually paid to the underwriters, I would have directed its return, with reimbursements for the expenses. A decree will be entered setting aside the sale upon condition of reimbursing the claimant for services and expenses, and referring it to the clerk to compute and report the amount.